this clock it's five minutes till so who knows sorry sorry if i uh... surprised you uh... wanna welcome you all here today welcome the participants in the fifth circuit bar association uh... appellate advocacy training situation hope you enjoy yourselves uh... the first k well sorry i'd just repeat on the uh... time uh... limits we have traffic lights we also have a timer when the yellow light comes on you have two minutes left when the red light uh... signals we ask that you conclude your argument as quickly as possible unless you're answering a judge's question we have read the briefs and the record excerpts before argument we have not necessarily gotten into the full record uh... one of these cases has quite a voluminous record so with that we'll call the first case of the morning number twelve two oh three seven nine scott versus livingston here for mister potapoff may it please the court alex potapoff for the appellant the district court's decision should be reversed for two principal reasons first the case is moot and second scott's claims are meritless i'd like to begin with the jurisdictional question of mootness scott's complaint was that there were irregular jehovah's witnesses meetings in the huntsville unit in two thousand nine by the time of trial that problem had actually been solved because the uh... huntsville chaplain had found additional jehovah's witnesses volunteers to provide regular meetings at huntsville in fact scott himself expected meetings to be regular at huntsville going forward but in any event scott was no longer at the huntsville unit he had been transferred to the high tower unit where there were and this is uncontested uh... a rotating cast of five regular jehovah's witnesses volunteers providing two weekly meetings of two hours a piece what what part does the does the settlement play in all of this well the the uh... the settlement your honor is uh... that's not a jurisdictional question so uh... you would address the mootness question first uh... and the settlement had nothing to do with his transfer or uh... with any of the facts that i just mentioned so the reason that he was transferred into the high tower unit was that the independent board of pardons and paroles concluded that uh... he was a sex offender that needed to go through nine months of the specific rehab program for sex offenders in order to be released on parole and actually the settlement uh... took place uh... after he was released on parole the settlement is a sort of completely separate issue from the mootness uh... and so once he certainly once he was transferred to the high tower unit uh... his case became moot uh... because he had neither the continuing harm because they were regular services nor any real and immediate threat of repeated injury in the future uh... in other words he'd lost his personal stake in the litigation there was no longer a justiciable controversy so why did the director decide to settle the case if it was moot well because the you know the uh... uh... the district court of course concluded that the case was not moot uh... but it did so on on grounds that are uh... clearly erroneous and which scott does not defend here uh... and in particular what the district court concluded was that while uh... scott may not have had a live claim anymore uh... that it could be inferred uh... that he was bringing claims on behalf of other Jehovah's Witnesses uh... and first of all there actually are no facts in the record about other Jehovah's Witnesses that were having irregular meetings uh... at that time but more importantly in order to maintain a live claim for himself scott needed to demonstrate a uh... uh... risk of injury to himself so for instance in the uh... Lyons case from the supreme court the complaint was about an illegal choke hold and Lyons contended that uh... this was regular practice for L.A. police that they routinely applied these choke holds uh... but the court said that he had no standing to ask for injunctive relief because he had to demonstrate that he himself was sufficiently likely to be subject to another choke hold in the future it's exactly the same here uh... whatever may be the case about Jehovah's Witnesses scott needed to demonstrate that he himself had some uh... immediate prospect of once again suffering from irregular Jehovah's Witnesses meetings and he couldn't do so he hasn't really attempted to do so so the primary argument that he makes uh... with respect to this mootness issue is that the transfer from Huntsville to the Hightower unit should be regarded as a voluntary cessation of the challenged activity on the part of TDCJ Scott is a pro se and he's the only plaintiff in this case that's correct he's the only plaintiff and so the uh... the reason that this should not be regarded as a voluntary cessation and treated under that rubric uh... is that we've identified a number of cases from this court uh... that treat transfers from one prison to another uh... as mooting events uh... so why don't you address Judge Hoyt's difficulties with the settlement he said it hadn't been consummated as I recall effectively uh... sure so the only uh... uh... the only term of the settlement uh... that Judge Hoyt identified as not having been consummated uh... is that the uh... that that Scott was not given a copy of the of a revised administrative directive uh... that was sort of changed to a satisfaction and that's not a term in the written agreement uh... all that the written agreement says is that uh... Scott gets three thousand dollars and in exchange uh... he releases all of his claims and so uh... as Scott I'm sorry what happened to the three thousand dollars what happened was uh... we went through the approval process uh... we created uh... or uh... we obtained a warrant for the three thousand dollars and we brought it to Scott and he refused to accept it in exchange for releasing his claims I thought he was put in his prison account trust account sure it was it was a warrant for three thousand dollars to be transferred into his prison account but he never but he did not accept it no it was never it was never transferred into his account and so he he now suggests uh... that uh... you know it was significant to him to have uh... a different form of payment uh... that he wanted it you know in in in cash or in some other uh... form of payment other than to his prison trust fund account but if you follow the the site that he gives for that it actually turns out that all he says is that he could have used the money and his wife could have used the money so this is really a a sort of uh... retroactive attempt to recharacterize the agreement but the most important point in the event is that the settlement agreement did not address the question of how that three thousand dollars would be paid uh... that's correct your honor but uh... that that doesn't undermine the agreement uh... you know he was out of prison at that time right that's true and since he hasn't accepted the money if we were to uphold the settlement you'd still own the money right that's true you could give him a check instead of or make a check payable to him and his wife for instance could you not uh... we we could in principle do that uh... your honor i'm not certain what the what the procedures are uh... the you know as as the agreement said the uh... payment has to be approved by uh... various officials and i'm not certain whether it doesn't say into his prison trust account because he wasn't in prison as you know when he signed it so it just says three thousand dollars that's true but the the the warrant as it was ultimately approved was to his prison trust account and so all i'm saying is that i can't represent now that uh... texas officials would approve another uh... another check that was in a different form so the settlement's not final is that what you're telling us well no the statement was final when we when we uh... when we performed our obligation and the court should have enforced it uh... but in any event also as as as i've noted when did the settlement become final in binding well it it it became binding immediately upon being signed uh... in february of twenty thirteen uh... and so then uh... it became enforceable when we delivered the uh... the money to him it looked on his face like it was a proposed a unilateral contract if i can invoke an ancient first year law term sure uh... we believe that it actually uh... evinces an intention on the part of both sides to be bound so clearly scott intended to be bound because he uh... in exchange for the three thousand dollars uh... but tdcj also signed the agreement uh... and the very next day uh... we submitted a motion uh... asking the court to state proceedings in light of the agreed settlement uh... so i think it's it's quite clear from the record as well as from the text that we intended to be bound but assuming that it is a unilateral contract then we accepted it by performance when we delivered the warrant to him so uh... either way it's enforceable do you happen to know the procedure if a prisoner is uh... released discharged and has money in his trust account does he get that money uh... i'm not certain precisely how the procedure works your honor i'd i'd assume he would i'm i'm just obviously the obvious suggestion is that if he's already been released and the money goes into the trust account then it's it's paid to him in some some fashion sure i i i i would assume so your honor i'm just not certain about the precise details but he is currently uh... still incarcerated because after being released on parole he violated his parole and was then reincarcerated to a different unit so is he back in the same institution that has his three thousand dollars? i'm sorry? so is he back in the same institution that has his three thousand dollars? well the three thousand dollars is not in any account yet because he simply didn't accept it uh... so so we had we had a we had a warrant for a transfer but he didn't accept it so that transaction was never consummated uh... but you know we certainly i believe that the warrant has actually lapsed so we would have to reissue it but we're certainly prepared to do so if that's the ground on which this court rules so uh... with that i would like to uh... quickly address scott's claims on the merits uh... his our lupa claim uh... in particular is foreclosed by this court's precedence at both steps of the our lupa analysis uh... with respect to substantial burden uh... this court has held no fewer than three times uh... in adkins and baranowski and o'deal that the direct supervision requirement does not create uh... a substantial burden on religious practice because any limitation on religious meetings is caused not by the policy itself but rather by the limited number of volunteers and so the way this court has summarized uh... the doctrine in sossaman is that there's no substantial burden if quote the small number of available lay volunteers makes religious services less frequent than an adherent would like but still available on a somewhat regular basis and that's precisely what's going on here uh... under the scott plan jehovah's witnesses have at least one meeting every week uh... so that's certainly quite regular uh... it may not be quite as frequent as scott would like but nevertheless that brings it squarely within the ambit of these three cases so and you're still talking huntsville right you're not talking throughout the you're just assuming this applies to huntsville well that the scott plan applies throughout tdcj okay so so currently tdcj policy is that uh... yeah in in in every unit uh... you're responding to the way the case evolved not the way it began sure but if if we look at uh... an earlier time frame uh... in uh... the time frame of the trial for instance in the eight months leading up to the trial uh... as we showed in the brief uh... jehovah's witnesses at the huntsville unit had had twenty six meetings so that several meetings a month uh... that's also far more frequent uh... than for instance in adkins uh... where they had meetings once a month and that was considered to be sufficiently regular uh... to prevent their uh... from being a substantial burden on religious practice so uh... scott's harloupa claim sort of fails at the outset of the substantial burden prong and then uh... the second uh... the second prong is a strict scrutiny prong pro se complaints seek I'm sorry what relief did he seek in his pro se complaint well it's not entirely clear uh... the way that the district court considered uh... consistently construed it uh... is as a request for an injunction with respect to the huntsville unit only uh... and that actually creates a separate justiciability problem of redressability uh... because even assuming that he got the injunction for the huntsville unit that he asked for that wouldn't solve any problem that he could possibly have now because he's not in the huntsville unit is that the only relief he sought was injunctive relief as to the huntsville unit uh... so that's that's how the court understood it you know it is a pro se complaint uh... so it's how does the state understand it uh... we we agree with the district court uh... the only the only concerns that uh... scott ever expressed were with respect to meetings at the huntsville unit but one could construe it more broadly to be tdcj wide uh... did he sue uh... livingston or thaler he did right? he did so he did he did sue uh... uh... sort of state statewide tdcj officials so with respect to the second prong of our lupa uh... this court stated in chance that uh... its previous decisions confirm that the direct supervision requirement is a permissible attempt to accommodate diverse religious exercise with limited resources and because the volunteer requirement is reasonable and necessary it is the least restrictive means of furthering tdcj's compelling interest in prison administration and so under for instance this court's decision in longoria the fact that that chance is out there and chance has already concluded that the direct supervision requirement passes strict scrutiny uh... that actually precludes any further challenges under our lupa uh... to the same policy and anything else would be a waste of judicial resources in fact with respect to the direct supervision requirement in particular uh... this court stated in mayfield that uh... uh... the only reason that the district court had to evaluate the direct supervision requirement under the strict scrutiny prong uh... is that there was no decision of this court at that time fully evaluating the policy and of course now there is such a decision it's chance and therefore scott's challenge was precluded at the second step of our lupa as well and uh... even assuming that uh... the district court were writing on a blank slate there was ample evidence in this case that the direct supervision requirement is crucial to prison security uh... in addition to sort of the common sense proposition uh... that it's valuable to have somebody overseeing uh... a large gathering of potentially dangerous offenders in prison uh... as judge posner said in johnson bay the reasonableness of the direct supervision requirement cannot reasonably be questioned there was also expert testimony uh... robert eason who is a tdcj regional director with ample security experience explained at length why the direct supervision requirement is the best means of supervising prison religious services so the reason that the prison system sought to overturn brown v veto is both concerns about safety of muslim services in particular and also the consequences of this decision which threatened to sort of brown v veto has been in effect for almost forty years so is there any demonstration for the sake of argument i gather that case is not tied to this one at this point in time is that fair to say that's true it was argued about a month ago and it's proceeding on a separate track we asked for the two cases to be consolidated but that that motion was denied but what i'm saying is brown v veto has been in effect for almost forty years allowing muslim inmates to meet without direct supervision right that's true and in in that case we provided sort of ample evidence of you know fights in muslim services and contraband and unmonitored muslim services uh... and the sort of threat being manifest of an alternative hierarchy being erected in muslim services but even in this case we pointed to uh... watson versus wakefield and lemons versus tdcj both of which discuss uh... sort of severe disturbances that occurred in unmonitored muslim services uh... as well as this court's decisions uh... in davis versus wall and damas versus crane for instance in damas versus crane this court discussed an unmonitored muslim service where a tape was played that promoted violence and disparaged other faiths i'd like to uh... save the remainder of my time thank you alright thank you sir okay miss milner uh... may it please the court my name is deborah milner and uh... i'm representing william scott uh... i'd first very like uh... very briefly like to address the mootness question uh... are you court appointed for mister scott uh... no your honor uh... mister scott uh... retained me uh... after the trial of this case uh... and after the events surrounding the uh... settlement what do you want this court to do uh... i would like this court to uphold the district court's final judgment i'm sorry say it again i would like this court to affirm the district court's final judgment and what's the effect of that uh... the effect of that is to essentially grant jehovah's witness inmates the same privileges that were accorded to muslim inmates under the brown versus uh... i'm sorry i'm sorry is there any record basis for saying that they don't now have that uh... yes there is uh... the volunteer requirement which the state refers to as the direct supervision requirement uh... is still in place uh... so jehovah's witnesses are still in a position that uh... if they cannot obtain outside volunteers that speculates that that might happen but you have a sole plaintiff who brings a lawsuit that seeks injunctive relief be charitable and say also declaratory relief pro se complaint the the practice has ceased there is no basis for capable of repetition yet escaping review because that must be specific as to him and not to others why isn't the case just on the mood on his face uh... yes your honor uh... well first of all uh... the state asserts that uh... mister scott was moved to a different unit where there were ample volunteers and that there was essentially no chance that he would ever be moved to another unit where the situation might differ uh... but in fact after he violated his parole he was reincarcerated and he was moved to a different unit uh... that was after trial so we don't have a full record of the situation was there but the record in the trial court says that the this problem originated because of the inherent variability uh... in the provision of services by volunteers uh... the record shows and i can give you some page sites if you'd like uh... that even when their volunteers who are signed up who have the best of intentions uh... that they become ill they have family problems so that's not the point why is the case not moved because your honor it's very capable of repetition even if mister scott is in a unit where today excuse me but he was he was removed from the prison i mean do you does a prisoner have a right to uh... maintain the same lawsuit over and like let's say it's denial of access to the library and he gets out on parole and then he comes back two years later can he keep assuming nothing has happened in the lawsuit is the lawsuit still alive and well your honor he was reincarcerated for the same no he was reincarcerated for violation of parole which is a separate matter i don't understand this at all uh... your honor i don't think that his release on parole muted this lawsuit the case was fully tried uh... prior to his release uh... and and all he wanted was to have access to uh... you know religious meetings x times a week and once he's out on parole he can he can spend twenty four hours a day in religious without the prison system having a thing to say about it i'd i'd just don't understand this so violates fundamental principles to me uh... well your honor i don't believe that uh... that aspect of muteness was raised before the district court or litigated that as you know it's jurisdictional do you have any case law to support that this is not moot other than capable of repetition uh... i was not prepared to address the issue of uh... his release on parole as a matter of muteness since it was not uh... briefed or raised before the court but i would be happy to submit uh... a supplemental brief on that as you can see back in the same unit he was in before no your honor he was sent to a different unit the pallage unit uh... that was not the subject of the early lawsuit it was not he was moved twice in the capable of repetition you had escaping review it's easy to slip past the restriction on that which is very severe that it must be not that it's capable of repeating itself as to others but it must be as to that particular plaintiff uh... alliance case and many others make that quite clear uh... yes your honor and i believe that the address that how can it be as to him when he's in a different prison system entirely with that which has not been the subject of litigation at all uh... because the rule is the same across all of the texas prisons the rule requiring uh... a volunteer uh... in order to uh... have access to religious services and the record shows that uh... volunteer uh... participation is is highly variable uh... and so the fact that mister scott is in a prison today where today is there's a volunteer uh... doesn't mean that tomorrow that volunteer isn't going to become sick or change their mind or uh... have ten other reasons why they can't show up and mister scott is right back in the same position where he was to start with and requiring him to file a new lawsuit each time the same harm occurs based on the same rule the same cause well he'd have to exhaust under the prison litigation reform act as to the new unit it seems to me and once he filed a grievance at the new unit you know maybe they'd go out and find a uh... a couple more volunteers mean there's no this is the less the less preferable way of handling a complaint like this for somebody who's decided to go back into the prison uh... well your honor i can see uh... the logic of that where the complaint relates not to a general policy but to a uh... specific event uh... in which perhaps the prison is violating a policy and it's easy to imagine that that might be isolated at that particular unit uh... but in this case mister scott's complaint is about a system-wide policy that applies to each unit uh... there's testimony from the unit chaplain in this case at the huntsville unit that he's not authorized to change the policy uh... so there's very little that a unit chaplain could do in terms of addressing the fundamental problem which is that as long as the volunteer requirement is in place uh... the access that jehovah's witnesses like mister scott and other uh... members of religious minorities have to religious services is highly variable and extremely limited i suppose the uh... the other panel that heard the case on brown v. beto of uh... uh... dissolves that consent decree and replaces it with the scott decree then what's your claim mister scott also has a ralupa claim that it's not dependent on the existence of the brown versus veto decree uh... and uh... the district court initially decided against him that was pre-holt and pre-habi-labi uh... after those cases were decided uh... the district court reconsidered its decision and uh... granted mister scott's ralupa claim or granted him relief pursuant to ralupa so you're saying that uh... habi-labi does away with our our authority in the atkins and the baranowski cases uh... yes your honor i do think that holt and habi-labi both uh... change the landscape of ralupa except for the fact actually that i mean i don't in what respect i mean uh... the fact that there's a sincere religious belief was accepted in habi-labi i'm sure it's accepted here so uh... least restrictive means analysis in habi-labi is completely different from what it is here uh... well your honor uh... there are several ways in which uh... holt and habi-labi changed the analysis that i believe was applied in atkins in those related cases uh... uh... one of those ways is that in atkins and similar cases uh... this court and the district courts uh... gave considerable uh... attention to the fact that those inmates had other methods of exercising their religious beliefs uh... and in holt the supreme court specifically disclaimed that analysis uh... saying that the test was whether there was a substantial burden on this particular religious exercise not whether quote not whether the ralupa claimant is able to engage in other forms of religious exercise i think that is something that has to be considered uh... in addition holt in particular uh... refocused the analysis on the statutory burden uh... to for the prison uh... to show least restrictive means by saying that courts must hold prisons to their statutory burden and finally uh... in habi-labi although the court did not uh... expressly discuss the matter in this way uh... i think the court's holding shows that the the idea that third-party action such as whether a volunteer shows up or not uh... no longer cuts off the causation between a rule and the substantial burden so in habi-labi uh... the court did not find that uh... the plaintiffs were not substantially burdened by the statute uh... because uh... habi-labi for example uh... maybe didn't even have any women who wanted to be insured or or habi-labi's uh... injury was caused by i'm assuming causation go to least restrictive means because they say they have a record of uh... of uh... discipline problems arising from unsupervised religious meetings uh... of course your honor uh... first of all and i'd like to say that there is i think a myth that's been created by the state uh... in saying that what's requested by mister scott is unsupervised religious activities the final judgment entered by the district court specifically says uh... that the state can provide any level of security that it desires it just simply cannot condition access to religious services on the presence of a volunteer the state now wants to tie volunteers to supervision of inmates but the state's long-standing volunteer policy uh... is in direct and explicit contradiction to this statement the volunteer policy says volunteers shall not under any circumstances supervise or manage offenders or other volunteers supervision of offenders and volunteers is a staff function the state criticizes the district court for not giving credence to the testimony of mister eason mister eason's testimony is very general he says that volunteers in fact provide supervision of inmates that testimony is absolutely contradicted by the state's written policy the purpose of a volunteer is to facilitate the service that is to provide religious counsel and guidance that has not been asserted by the state as some sort of compelling interest justifying the volunteer policy are they ministers or uh... they are they don't have to be ministers uh... they have to be they have to have some sort of letter of sponsorship from their religious body uh... but in general and they're trained among other things in security uh... they receive uh... some level of training there's nothing right i'm not saying they're guards but they they do they're in there for a reason and that is to make sure that the inmates don't start acting up aside from the religious you know if they were to act up then uh... the uh... supervisor uh... the yeah the the volunteer would go out into the hallway and call a guard right your honor one can assume that that would happen but I think you can assume that would happen the state has specifically said that volunteers are there to facilitate the religious observance and that they are not permitted to supervise inmates and with respect to the state's uh... evidence on problems that may have arisen uh... in other types of services uh... there's no real direct evidence in the record there's there aren't any incident reports or anything like that uh... instead the state statesites to a number uh... of other uh... court decisions that relate in some way to some kind of problem in a religious service uh... a couple of these are addressed in the briefing uh... the statesites lemons this was a case uh... if the court goes back and reads the the decision uh... there was some type of disturbance but at the end of the day no disciplinary action was taken against any inmate and the service was allowed to proceed uh... in the Watson case the inmate coordinator actually did exactly what your honor was suggesting it appeared that there was going to be a problem the inmate coordinator left and went and found a guard and reported the incident uh... uh... the problem again was addressed before anything actually happened and in the DeMoss case uh... the state argued and won uh... that videotaping religious services that were led by inmates uh... was an acceptable and effective form of security uh... the state has the burden here of showing not just that direct supervision uh... whether provided by a volunteer in contravention of the policy or provided by a guard uh... is somehow connected with security but it's in fact the least restrictive means and the state has not met that burden. If you would uh... save a little time to talk about the release yes I'm looking at the affidavit uh... uh... here signed by Mr. Scott as well as uh... I think it's an assistant attorney general law enforcement defense division uh... as well on behalf of the state and it recites a very straightforward uh... release uh... I'm not sure I've heard any explanations as to why that's not that this doesn't bar this claim uh... a couple of reasons your honor uh... first Mr. Scott was pro se at the time of this meeting he was in there with two lawyers he had no lawyer uh... and I believe the state is trying to craft how do you settle a case with a pro se plaintiff how do you settle with a pro se plaintiff if they weren't bypassing a lawyer he elected to represent himself uh... I do believe that the state is now trying to graft a legal meaning onto the affidavit that would not have been at all apparent to someone like Mr. Scott uh... first of all it's called an affidavit it's not called a settlement agreement which would lead a lay person to believe that it was not a contract I mean the federal district courts in this court rely on on inmate affidavits all the time various kinds of controversies uh... I agree that a court can rely on an inmate affidavit but I think that's a separate question of whether it's a valid and binding contract he is literate yes your honor he relied on his pleadings didn't he he did write his pleadings his signature was sufficient to get this whole proceeding started and now he signs it under oath and we said we were going to disregard it because he didn't have a lawyer I do not believe he's trying to disregard his signature but there are a couple of other things to take into consideration one is that texas rule I was commenting on your argument that because he was without counsel that that caused some difficulty uh... I do not believe I'm suggesting to you that without on his own signature unsworn signature he was able to to activate the entire enterprise of access to the federal court and we relied upon those and that's why we're here uh... I do not believe that someone who is a pro se plaintiff would have anticipated that something called an affidavit that was only witnessed by the attorneys for the other side rather than signed by them as parties would have been interpreted as a settlement agreement that was binding on yes your honor let me address another point related to that agreement uh... the states council told you that Mr. Scott was offered the three thousand dollars in the form of a warrant and that he simply refused to accept it uh... but what happened and what supported in the testimony from the states attorney and Mr. Scott is that several months after the meeting in which he signed the affidavit the states council again met with him while he was still pro se and presented him with a new settlement agreement as well as a multi-page release uh... Mr. Scott informed her that he did not intend to sign it and so he was not given the three thousand dollars that release and that settlement agreement contained many additional terms that are not included in the release or in the affidavit uh... and in particular the affidavit simply says a release of his claims while the release the state sought to have him sign in order to obtain the three thousand dollars contained not only a release of his claims in this lawsuit but a release of any future claims related to any matter in this lawsuit so for example if he was in the future denied services he would not be able to bring that claim so are you arguing that there's another independent release that we don't have? uh... the release is at are you arguing that there is another release? a second release? uh... yes your honor the state presented him with an additional release they replaced this one? uh... yes it's at page ten fifty of the record and that's what Mr. Scott refused to sign and why he was not given the three thousand dollars. Now which one did he refuse to sign? the uh... second one with the... well yes I understand the second one but if he did refuse to sign the second one what's wrong with the first one? uh... even if the first one is accepted as a valid and binding contract uh... the state did not provide the three thousand dollars the state only provided... I don't understand the argument about the the second one which another agreement never consummated, never reached affects the validity of this one. I thought you were going to suggest to me that they did it under a new agreement and sort of a novation of this contract I still don't understand why this as it's written it's not enforceable the state refused to provide the three thousand dollars mentioned in the signed affidavit because Mr. Scott would not sign a new and additional settlement agreement and release that contained new and additional terms that were not present in the affidavit. What's your probative evidence of the reasons for non-signing or non-tender of the money? because Mr. Potapoff said it was because he wanted cash instead of in his prison account uh... the testimony of uh... the state's attorney who was present in both the meetings is found uh... around page twenty four fifty five of the record and I don't have the exact page uh... but she testified that she brought him the three thousand dollars and the additional paperwork and he would not sign the additional paperwork uh... and the paperwork was necessary in order for her to release the warrant uh... so uh... I see my time has concluded so unless the court has further questions I will so I guess you know what you need to respond to first uh... I suppose that this last exchange about the uh... well the uh... what I would say your honor is in in Scott's briefing uh... what he said was uh... that the objection was to uh... a the uh... lack of being given a revised administrative directive and b that the money was uh... not provided in the appropriate form and so uh... we did uh... uh... we did ask Scott to sign uh... a more detailed agreement at that point that's a that's a common thing where you in one agreement you anticipate a more formal agreement later on it's not just more detailed according to uh... uh... Ms. Milner's statement to us to us it was broader because it dealt with any future claims is that right uh... no we we think we think that it simply elaborated on the original agreement in that he was releasing all of his claims with prejudice why do you need another agreement uh... I mean uh... it was simply it was simply more formal more detailed uh... and for instance it provided it I think of course the bill is on its face and you're also telling us well we also tried to get a little more formal agreement I don't know what that means your honor I don't think it was I don't think it was strictly uh... I don't think that was strictly speaking necessary and it was not necessary uh... your honor I'd like to just read quickly from the uh... original uh... agreement uh... because uh... we heard from uh... Scott's counsel that he would not have understood what it meant uh... but in the agreement he said he attested that in exchange for the settlement amount defendant will be entitled to a signed release and dismissal with prejudice of all of my claims and costs as plaintiff herein so that's about as clear as it gets uh... and uh... certainly scott uh... would have been expected to understand it uh... and so he should have accepted the three thousand dollars in exchange for it you were just reading from the first one right from the first one that's the first one was just about as clear as it gets then I don't I don't understand the need well we we would be we would be happy for him simply to accept the money and go with the first agreement uh... we don't we don't need him to sign the second agreement and I don't believe the record suggests that uh... that was the that was the sticking point so you're you're representing to us I just want to be sure I'm not putting words in your mouth you're representing to us that it's the state's position based on the first agreement if he will go ahead and accept the funds that the state is willing to settle on that basis without requiring any additional release or any expanded or more detailed settlement agreement that that is our position uh... and and I also but but uh... uh... it's also our position of course that uh... the court should never reach that because the case is moot uh... and I wanted to quickly make a couple of points uh... with respect to that as well uh... first of all the the new unit uh... that he has been reincarcerated into the the pallage unit uh... again uh... my colleague said that there was nothing in the record about it but of course Scott is currently at that unit uh... if there were irregular Jehovah's Witnesses services there he could very easily have conveyed that to the district court he conveyed that to this court in the form of an affidavit he's never done so uh... so I think that's a fair basis to infer that uh... there are regular Jehovah's Witnesses services there and in any event it's his burden to show subject matter jurisdiction and he hasn't done that uh... and also uh... with respect to the capable of repetition but evading review doctrine uh... the first prong of that test is whether or not the injury is too brief to be fully litigated before it stops and obviously the direct supervision requirement gets litigated all the time it's currently being litigated in Brown thank you very much your honor